**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Akesha Hill Joiner, | : | Case No. 3:07 CV 2906 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S. C. §§ 1381 and 405(g). Pending are Briefs on the Merits filed by the parties and Plaintiff's Reply (Docket Nos. 14, 15 and 18). For the reasons set forth below, the Commissioner's decision is affirmed.

**PROCEDURAL BACKGROUND**

Initially, Plaintiff applied for SSI on November 26, 2001, alleging that she had been disabled since October 20, 2001 (Tr. 65-68). The application was denied initially and on reconsideration (Tr. 61-64, 55-58). Plaintiff filed a second application for SSI on March 20, 2003 alleging that she had been disabled since January 3, 2003 (Tr. 69-74). This application was also denied initially and upon reconsideration (Tr. 51-53, 47-50). Plaintiff's request for a hearing was granted and on June 27, 2005, a hearing was held before Administrative Law Judge (ALJ) Frederick McGrath (Tr. 531). Plaintiff, represented by counsel Loretta Wiley, and Vocational Expert (VE) Edwin Yates appeared and testified. On March 23, 2005, the ALJ rendered an unfavorable decision finding that Plaintiff

was not disabled as defined under the Act (Tr. 17-25). The Appeals Council denied Plaintiff's request for review on March 23, 2005, thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 6-8).

## JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## FACTUAL BACKGROUND

*Plaintiff's Testimony*

Plaintiff testified at the administrative hearing that she completed the tenth grade (Tr. 536). She and her two minor children resided with her grandmother and uncle (Tr. 542).

Plaintiff was involved in a car accident on January 10, 2003. She became disabled as a result of the accident (Tr. 543). Plaintiff was also involved in a "slip and fall" during which she sustained a fractured backbone. She underwent therapy; however, the pain persisted and was particularly noticeable while bending or moving "a lot" (Tr. 538).

Plaintiff was treated for hypertension, migraine headaches, ear infection and a clogged left ear. She continued to suffer from edema in her legs (Tr. 547, 549). She encountered "black flashes" followed by tingling (Tr. 549). Her anxiety was evidenced by fastidious cleaning, a lack of concentration, a lack of understanding, excessive crying, nightmares, insomnia and mood swings (Tr. 550, 551). Plaintiff lacked the ability to communicate effectively.

Plaintiff recounted that she worked at Wendys® for up to 1½ years (Tr. 538). Plaintiff was employed as a telephone solicitor for one month. Her inability to comprehend instructions, spell or speak interfered with her success as a telephone solicitor. Plaintiff had worked as a salesperson for which she obtained 90 days of training (Tr. 537). Plaintiff had worked for approximately eight months packing shaggy rugs in boxes (Tr. 539). For seven months, Plaintiff was employed as a housekeeper (Tr. 541).

While packaging rugs, Plaintiff lifted up to twenty pounds at a time (Tr. 540). At the time of the hearing,

Plaintiff could lift a gallon of milk but she could not lift a bowling ball (Tr. 538-539). She could walk a block and climb three stairs with no difficulty. She could not stand for more than twenty minutes in the same position putting a lot of pressure on one leg. She had difficulty sitting because of her back (Tr. 548). Standing after sitting caused severe back pain. She had difficulty reaching over her head (Tr. 549).

During a typical day, Plaintiff sometimes got her children up for school (Tr. 542-543). Her 12-year-old daughter cooked meals for the family (Tr. 543). Plaintiff considered herself housebound so she typically spent most of the day lying down (Tr. 552).

Plaintiff was prescribed Zoloft, a medication prescribed for depression and certain anxiety conditions, Motrin, a pain reliever, and Vicodin, a pain killer (Tr. 545-546). She saw one counselor twice weekly and another counselor once every week (Tr. 546).

*VE Testimony*

The VE testified that an individual of Plaintiff's age, education, past work experience and capability for light work, unskilled work limited to single routine and repetitive tasks could perform work as a fast food employee and housekeeping cleaner (Tr. 553). There are approximately 16,000 fast food worker positions in Northwest Ohio and 5,200 housekeeping/cleaner jobs in the area.

Limiting the jobs to sedentary, unskilled work, Plaintiff could perform work as a weight tester, hand mounter and getterer (applying chemical solution to stems of lead wires). There were 75 weight tester positions, 400 hand mounter positions and 350 getterer positions in the local economy (Tr. 554). A typical worker could learn the techniques required to perform these jobs after a short demonstration up to and including up to one month. An employee who is incapable of meeting the productivity, attendance or concentration levels of 80% would be terminated (Tr. 555).

**MEDICAL EVIDENCE**

1. **American Radiological Services/Toledo Chiropractic (Tr. 252-254; 255-261, 277).**

After examining Plaintiff on January 13, 2003, and again on January 16, 2003, Dr. Steve Morrison

3

diagnosed her with lumbar/pelvic strain/sprain (Tr. 253). X-rays of Plaintiff's thoracic and lumbar spine and pelvis showed signs of degeneration of the facet joints (Tr. 255).

**2.     Dr. Paul Chandler (Tr. 280)**

On October 9, 2001, Dr. Paul Chandler treated Plaintiff for possible chronic cystitis. The treatment plan included obtaining cultures and instructing Plaintiff to drink plenty of fluids (Tr. 280).

3.     **Comprehensive Addiction Service Systems (Tr. 382).**

Plaintiff was a patient in the residential subacute detoxification unit on August 11 and 12, 2003. She successfully completed the program (Tr. 382).

**4.     Dr. David J. Forsythe (Tr. 283-286).**

Dr. Forsythe, a psychiatrist, examined Plaintiff on May 5, 2003, after which he noticed that Plaintiff had a borderline level of intellectual functioning. He diagnosed her with an adjustment disorder with depressed mood, obesity, hypertension, psychosocial stressors and some mild difficulty in social, occupational or school functioning (Tr. 286).

**5.     Lutheran Social Services (Tr. 409-414).**

On October 1, 2003, Plaintiff underwent an assessment including her history and issues (Tr. 413-414). She was diagnosed with dysthymic disorder, late onset and post traumatic stress (Tr. 412). Plaintiff failed to follow through with the prescribed treatment (Tr. 410). Her case was closed on April 23, 2004 (Tr. 409).

**6.     Dr. Randall P. McCormick (Tr. 343-383).**

Dr. McCormick monitored Plaintiff's consumption of Zoloft on September 15, 2003 (Tr. 348). He treated Plaintiff for symptoms of a cold on September 23 and October 3, 2003 (Tr. 344-346, 345).

**7.     Medical College of Ohio Hospital (Tr. 223-230).**

Dr. G. T. Matanguihan examined Plaintiff on or about February 6, 2002, finding that Plaintiff had mechanical low back pain with acute exacerbations. The pain radiated down to her left foot. Her pain was aggravated by prolonged sitting, standing and bending (Tr. 226). Dr. Matanguihan opined that Plaintiff could raise

her shoulders, elbows, wrists, fingers, hips, knees, feet and hands against normal resistance (Tr. 228). Her range of motion in the cervical sine, hips, knees, ankles, shoulder, elbows, wrists and hands/fingers was normal (Tr. 229, 230). The range of motion in Plaintiff's dorsolumbar spine was extremely diminished (Tr. 230).

**8.     Physical and Mental Residual Functional Capacity Assessments (Tr. 231-238; 404-407).**

Dr. Nick C. Albert reviewed the record and opined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and engage in unlimited pushing and/or pulling (Tr. 232). Plaintiff could occasionally climb using a ladder, rope and scaffold and occasionally stoop. Plaintiff could frequently climb using a ramp or stairs, balance, kneel, crouch and crawl (Tr. 233). There were no manipulative, visual, communicative or environmental limitations (Tr. 234-235). In the consultant's opinion, Plaintiff was markedly impaired by pain, aggravated by prolonged sitting, standing or bending (Tr. 239).

Dr. David W. Demuth opined that Plaintiff had marked limitations in her ability to understand, remember or carry out detailed instructions (Tr. 404). In the psychiatric review, he opined that Plaintiff had a medically determinable impairment best described as an adjustment disorder with a depressed mood. Plaintiff exhibited at least two of the symptoms associated with a disturbance of mood, namely, appetite and sleep disturbances (Tr. 393). Dr. Demuth opined that Plaintiff suffered from borderline intellectual functioning (Tr. 394). She was limited mildly in her ability to engage in activities of daily living and she was also limited mildly in her ability to maintain social function (Tr. 394, 400).

**9.     Dr. James Roby (Tr. 270-274).**

On November 6, 2002, Plaintiff presented to Dr. Roby for treatment of depression and hypertension. Dr. Roby discussed the diagnosis and treatment for depression and apparently administered a DNA probe for strep bacteria (Tr. 278). On March 26, 2003, Dr. Roby diagnosed Plaintiff with right leg pain and motor vehicle accident trauma (Tr. 273). He prescribed an antidepressant. Plaintiff failed to keep appointments on April 4 or 18 to follow up with the prescribed treatment (Tr. 274).

**10.    St. Vincent Mercy Medical Center (Tr. 288-342; 353-357; 464-527).**

The X-ray of Plaintiff's chest taken on April 16, 1995 was normal. On June 14, 1995, Plaintiff was treated for cellulitis in her ankle and foot (Tr. 368).

On March 13, 2001, Plaintiff was prescribed medication for back strain (Tr. 335-336, 340). The X-rays of Plaintiff's chest taken on July 14, 2001, showed a normal heart and clear lungs (Tr. 331). On September 24, 2003, Dr. McCormick treated Plaintiff for shoulder strain with modalities and therapeutic exercise (Tr. 385). She was also treated on July 14, 2001, for a sore throat (Tr. 334A). In August 2001, Plaintiff dropped a video cassette recorder on her toe (Tr. 326). Plaintiff's left foot pain could not be attributed to a fracture or dislocation. Further there was no radiopaque evidence of foreign bodies in the foot (Tr. 325). She complained of foot pain on August 13 and was prescribed Motrin (Tr. 328-329).

The X-rays of Plaintiff's chest administered on January 22, 2002, showed no active disease and were otherwise unremarkable (Tr. 310). Plaintiff was treated for symptoms associated with a cold or flu virus on February 13, 2002 (Tr. 305-309). On February 17, 2002, Plaintiff was prescribed a pain reliever and muscle relaxant to treat rectal bleeding (Tr. 298-304).

Plaintiff was treated in August 2003 for right shoulder pain and bilateral knee pain (Tr. 353). Physical therapy three times per week was prescribed and samples of a pain reliever were dispensed (Tr. 354). In May 2003, Plaintiff was prescribed a pain killer to treat painful legs (Tr. 295). On August 15, 2003, Plaintiff presented to the emergency room with abnormal bleeding. Apparently, the bleeding was stopped and a pain reliever was prescribed (Tr. 287-294).

Plaintiff presented to the Family Care Center on January 19, 2004, for treatment of an ear inflammation. A wax chunk imbedded deep in the ear canal was extracted (Tr. 488). She returned for treatment of an earache on March 9, 2004. Drug therapy was employed (Tr. 527). On May 21, 2004, Plaintiff was diagnosed with bilateral inflammation of the outer ear (Tr. 477, 483). There was no computed tomographic (CT) scan evidence of mastoiditis or fluid in the middle ear on May 21, 2004. There was, however, inflammatory debris in the auditory canal (Tr. 471). She was treated with antibiotics administered intravenously (Tr. 473-474). On August 28, 2004, Plaintiff was treated on an emergency basis for an earache. Apparently, her ear canal was swollen (Tr. 497, 498).

On August 30, 2004, Plaintiff was diagnosed with acute exacerbation of chronic inflammation of the outer ear related to self-instrumentation (Tr. 468). On August 31, 2004, the results of the radiological examination showed no abnormalities of the brain and abnormal fluid was identified in the right mastoid (Tr. 470). The pain in her right ear persisted (Tr. 505). On September 15, 2004, the results of the magnetic resonance imaging (MRI) were revealed, showing no abnormalities of the brain. Her ear was drained and she improved with the infusion of an antibiotic (Tr. 465).

**11.    St. Vincent Mercy Medical Center Physical Therapy Department (Tr. 383-385).**

On September 24, 2003, modalities and therapeutic exercise were employed to treat a right shoulder strain (Tr. 385).

**12.    Toledo Hospital/Promedica Health System (Tr. 215-222, 241-251; 262-263; 415-431).**

Plaintiff underwent a laparoscopy on November 12, 2001 to resolve pelvic pain (Tr. 218, 220). Plaintiff was treated for severe injuries resulting from a major vehicle collision on January 10, 2003 (Tr. 241). She was diagnosed with and treated for right elbow and right tibia fibula contusions (Tr. 243). No definite fracture was identified by the X-rays (Tr. 248, 262). When released, Plaintiff was advised to consume over the counter Motrin or Tylenol for pain (Tr. 251).

Plaintiff presented to the emergency room with bilateral ear pain on May 17 and May 19, 2004, chest pains on December 10, 2004, and nonspecific abdominal pain on December 26, 2004 (Tr. 415, 425, 429). She was diagnosed with bilateral otitis and prescribed ear drops (Tr. 431). There was no evidence of cardiopulmonary disease (Tr. 425). The results from the chemical profile administered on December 26, 2004 were normal, consequently, the abdominal pain was attributed to gastrointestinal reflux or influenza (Tr. 415-419; 419-422).

**13.    Toledo Public Schools (Tr. 194-214).**

On January 13 and 20, 1993, Plaintiff, a ninth grader, was deemed mildly mentally impaired. Tests of her general intelligence showed a verbal score of 62 and a performance score of 62. She tested within the third grade level range of academic functioning (Tr. 200). On the Wechsler Intelligence Scale for Children, Plaintiff obtained a verbal score of 69, a performance score of 62 and a full scale intelligence quotient of 62 (Tr. 202). During review

7

of her individualized education plan, it was noted that Plaintiff was a "nonattender" (Tr. 209, 212, 213). **14. Dr. Donald G. Weathers (Tr. 264-269).**

When treated after the "fender bender" on January 10, 2003, Dr. Weathers noted that Plaintiff had minimal symptoms and received minimal treatment because she did not have any significant complaints (Tr. 264). On January 24, 2003, Dr. Weathers conducted a follow-up evaluation, finding that Plaintiff's wounds had been properly dressed and physical therapy had been administered (Tr. 266, 269).

**15.    Zepf Community Mental Health Center (Tr. 432-463).**

Plaintiff underwent the initial diagnostic assessment on November 14, 2003. She was diagnosed with major depressive disorder, recurrent with severe psychotic features, alcohol and cannabis abuse, migraines, hypertension, chronic back pain per client report, economic and housing stressors and moderate difficulties in social, occupational or school functioning (Tr. 462). Dr. Barbara Funke evaluated Plaintiff on December 11, 2003, finding that the diagnosis of the diagnostic clinician was accurate except that Plaintiff had a serious impairment in her social, occupational or school functioning (Tr. 458).

Plaintiff failed to keep an appointment on January 2, 2004 but was treated on January 6. The dosage of medication prescribed to treat depression was increased (Tr. 453). Plaintiff failed to keep appointments scheduled with Dr. Funke on January 13, February 5, February 16 and March 5, 2004 (Tr. 449-452). In September Dr. Funke restarted Plaintiff on her medication (Tr. 448). However, Plaintiff failed to attend scheduled appointments in October, November and December 2004 and February 2005 (Tr. 443, 445-447). Later in February 2005, Plaintiff attended the scheduled session to reassess treatment goals (Tr. 444). Several times in March 2005, Plaintiff was present when a plan addendum was initiated and her needs assessed (Tr. 436-442). On April 4, 2005, Plaintiff failed to appear for treatment (Tr. 435). Plaintiff's symptoms appeared to be under control on April 11, 2005 (Tr. 433). She did not appear for her appointment on April 18, 1005 (Tr. 432).

## **STANDARD OF DISABILITY**

The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. *Heston v. Commissioner of Social Security,* 245 F.3d 528, 534 (6th Cir. 2001) (*citing Abbott v. Sullivan,*

905 F.2d 918, 923 (6th Cir. 1990)). First, plaintiff must demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time he or she seeks disability benefits. *Id.* (*citing* 20 C.F.R. §§ 404.1520(b) and 416.920(b)(2000)). Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id*. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." *Id.* (*citing* 20 C.F.R. §§ 404.1520(c) and 416.920(c)(2000)). Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.* (*citing* 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000)). Fourth, if the plaintiff's impairment does not prevent her or him from doing his or her past relevant work, plaintiff is not disabled. *Id.* For the fifth and final step, even if the plaintiff's impairment does prevent him or her from doing past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Abbott,* 905 F.2d at 923).

## ALJ'S DETERMINATIONS

Employing the standard of disability, the ALJ considered the testimony adduced at the hearing and the medical evidence set forth above and made the following findings:

1. Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision.

2. Plaintiff had severe impairments, namely, major depressive disorder, borderline intellectual functioning and bilateral leg pain. These medically determinable impairments did not meet or medically equal one or more of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3. Plaintiff was unable to perform any past relevant work.

4. Plaintiff had the residual functional capacity to perform work activity exerting up to twenty pounds of force occasionally, and/or up to ten pounds of force frequently and/or a negligible amount of force constantly to move objects. Plaintiff was capable of standing/walking for six hours of an eight-hour work day; Plaintiff could sit for six hours of an eight-hour work day; and Plaintiff was limited to simple, routine and repetitive tasks.

5. Plaintiff was capable of performing past relevant work as a fast food worker and cleaner in housekeeping. This work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

      6.        Plaintiff was not under a disability as defined in the Act at any time through the date of this decision.

(Tr. 17-24).

This decision became the final decision of the Commissioner on July 27, 2007, when the Appeals Council denied review (Tr. 6-8).

## STANDARD OF REVIEW

Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Cutlip v. Secretary of Health and Human Services*, 25 F. 3d 284, 286 (1994) (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id.* (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir.1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole. *Id*. (*citing Kirk*, 667 F.2d at 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983), and even if substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## DISCUSSION

Plaintiff argues that she has the required level of severity for a finding that she is mentally retarded under 12.05C of the Listing of Impairments. She has (1) a valid intelligent quotient (IQ) within the range contemplated by the Listing (2) physical and mental impairments that impose significant work-related limitation of function and (3) deficits in adaptive functioning manifested during the developmental period.

10

When an ALJ determines if a claimant is disabled, the claimant carries the burden of proving that she "meets or equals a listed impairment." *Catron v.* Astrue, 2008 WL 4304502, *4 (E. D. Ky. 2008) (*citing Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment).  The claimant's impairment must result from an anatomical, physiological, or psychological abnormality which can be shown using medically accepted clinical and laboratory diagnostic techniques.  *Id.* (*citing* 20 C.F.R. § 416.908).  To meet this burden, the claimant must provide medical evidence showing that she suffers from an impairment that meets or medically equals one of the listed impairments.  *Id*.

Under the listed impairments, mental retardation refers to a significantly sub average general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22).  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05 (Thomson Reuters/West 2008).  The required level of severity for this disorder is met when the requirements in A, B, C, **or** D are satisfied.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05 (Thomson Reuters/West 2008).  Under "C," the claimant must have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05 (Thomson Reuters/West 2008).  The regulations specify that a claimant will meet the listing for mental retardation only if the claimant's impairment satisfies the diagnostic description in the introductory paragraph *and* one of the four sets of criteria.  *Foster, supra,* 279 F.3d at 354 (*citing* 20 C. F. R. Pt. 404, Subpt. P, App. 1, § 12.00(A) *as amended by* 65 Fed.Reg. 50746, 50776 (August 21, 2000) (emphasis added).

In determining if the decision below is supported by substantial evidence, the Magistrate finds that the ALJ did consider whether Plaintiff was disabled under Section 12.05 of the Listing.  The ALJ made a specific finding that the evidence of Plaintiff's deficits in adaptive behavior was not of the severity to meet the Listing.  The ALJ acknowledged that Plaintiff had obtained a verbal score of 69, a performance score of 62 and a full scale IQ of 62 on the Wechsler Intelligence Scale for Children.  However, the evidence suggests that Plaintiff had higher adaptive abilities than required under the Listing.  Plaintiff's testimony suggests that she could manage simple, repetitive tasks (Tr. 537).  She had been able to work and earn income.  She utilized community services for counseling and

11

medical care. She occasionally cared for her children. This evidence is not clear and comprehensive evidence of significantly sub average general intellectual functioning. Further, this evidence is not indicative that Plaintiff had significant deficits in adaptive behavior initially manifested during the developmental period.

Even if the ALJ had considered Plaintiff's lack of communication skills, lack of daily living skills, lack of consistent employment and third grade reading level, such evidence only shows, at best, that Plaintiff met the presumptive criteria for mental retardation. It does not automatically translate into the second element of the listed impairment, namely, that Plaintiff had a significant work related limitation of function or deficits in adaptive functioning. Under these facts, the Commissioner did not err by failing to find that Plaintiff did not prove that her impairments met 12.05C of the Listing.

Finally, Plaintiff failed to demonstrate that her physical impairments or depression are of the severity to impose additional and significant work-related limitation of function. Reports of Drs. Roby and Funke on Plaintiff's treatment for depression are inconclusive as she was unable to keep several appointments. Several pain relievers were prescribed to provide relief for her back. These reports, combined with evidence of mild mental retardation, do not provide evidence of significant work related limitation of function or deficits in adaptive functioning. The Magistrate cannot find the ALJ erred in determining that Plaintiff did not meet the requirements of 12.05 of the Listing.

## **CONCLUSION**

For these reasons, the Commissioner's decision is affirmed and the case is dismissed**.**

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge


Date: October 27, 2008